<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PENNSYLVANIA MANUFACTURERS ASSOCIATION INSURANCE COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> NEW JERSEY MANUFACTURERS INSURANCE COMPANY *et al.*, <br><br> Defendants. | Civil Action No. 25-01384 (GC) (RLS) <br><br> <u>**MEMORANDUM OPINION**</u> |

<u>**CASTNER, District Judge**</u>

**THIS MATTER** comes before the Court upon Plaintiff Pennsylvania Manufacturers Association Insurance Company's (PMA) Motion for Summary Judgment (ECF No. 24) and Defendant New Jersey Manufacturers Insurance Company's (NJM) Motion for Summary Judgment (ECF No. 23). Both parties opposed the other's Motion, (ECF Nos. 25, 27), and replied in support of their own Motion, (ECF Nos. 26, 28). The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure (Rule) 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, PMA's Motion is **DENIED**, and NJM's Motion is **GRANTED**.

Case 3:25-cv-01384-GC-RLS    Document 32    Filed 05/28/26    Page 2 of 16 PageID: 735

I. **BACKGROUND**

A. **Factual Background**[1]

1. *2020 Accident and Subsequent State Lawsuit*

On January 21, 2020, Defendant Jamar Jones was involved in a collision with a vehicle owned and operated by Joseph Zalescik. (ECF No. 23-2 ¶ 13.) At the time of the accident, Zalescik was employed by Capital Health Systems Inc. (CHS). (*Id.* ¶ 14.) CHS was insured by a commercial insurance policy from PMA, and Zalescik was insured by a personal auto policy and personal liability umbrella policy from NJM. (*Id.* ¶¶ 1, 4, 7, 15, 17.) Because of the employment relationship, Zalescik and CHS are insured by both the PMA and NJM policies. (*See id.* ¶¶ 14-18.)

On August 2, 2021, Jones filed a lawsuit in the Superior Court of New Jersey, Mercer County. (*Id.* ¶ 19.) Zalescik was named as the sole defendant. (*Id.*) Jones alleged that Zalescik negligently operated his vehicle and caused the accident, leading Jones to sustain severe and permanent injuries. (*Id.* ¶¶ 21-22.) On June 19, 2023, Jones amended his state lawsuit to name CHS as a defendant and alleged that at the time of the accident, Zalescik was operating his vehicle within the scope of his employment at CHS. (*Id.* ¶¶ 23-24.) The amended complaint alleged that CHS was vicariously liable for Jones' injuries. (*Id.* ¶ 25.)

---

[1] On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)). The factual circumstances surrounding this action are set forth in the parties' submissions in accordance with Local Civil Rule 56.1. The parties have submitted a Joint Statement of Material Facts which is found at both ECF Nos. 23-2 and 24-1, although for ease the Court will cite solely to ECF No. 23-2. Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

On June 11, 2025, the parties agreed to settle the state lawsuit for $950,000. (*Id.* ¶ 26.) NJM paid Jones $500,000 as the primary layer of insurance coverage for Zalescik and CHS. (*Id.* ¶ 27.) PMA and NJM agree that this portion of the settlement is covered by the NJM primary policy. (*Id.*) PMA paid Jones the remaining $450,000. (*Id.* ¶ 28.) PMA and NJM dispute whether this amount should be covered entirely by the PMA policy or shared equally between the PMA policy and the NJM umbrella policy. (*Id.* ¶ 28.)

### 2.    *Insurance Policy Terms*

PMA issued a commercial insurance policy to CHS for the period of June 1, 2019 to June 1, 2020. (*Id.* ¶ 1.) The PMA policy has a coverage limit of $1 million for bodily injury or property damage resulting from an automobile accident. (*See id.* ¶¶ 1-2.) The PMA policy provides:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto" . . .
>
> We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense". However, we have no duty to defend any "insured" against a "suit" seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply . . .

(*Id.* ¶ 2.) The PMA policy also includes an "other insurance" provision that reads:

> a. For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance . . .
>
> d. When this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

(*Id.* ¶ 3.)

NJM issued a personal auto policy (NJM primary policy) to Zalescik for the period of April 11, 2019 to April 11, 2020.  (*Id.* ¶ 4.)  This policy has a limit of $500,000.  (*Id.*)  The insuring provision for the NJM primary policy reads:

> We will pay damages for bodily injury or property damage for which any Insured becomes legally responsible because of an auto accident.  We will settle or defend, as we consider appropriate, any claim or suit asking for these damages.  In addition to our limit of liability, we will pay all defense costs we incur.  Our duty to settle or defend ends when our limit of liability for this coverage has been exhausted by payment of the policy limits.  We have no duty to defend any suit or settle any claim for bodily injury or property damage not covered under this policy.

(*Id.* ¶ 5.)  The NJM primary policy includes an "other insurance" provision specifying that:

> If there is other applicable liability insurance we will pay only our share of the loss.  Our share is the proportion that our limit of liability bears to the total of all applicable limits.  However, any insurance we provide for a vehicle you do not own, including any vehicle while used as a temporary substitute for your covered auto, shall be excess over any other collectible insurance.  Additionally, coverage for any vehicle you do not own while connected to a trailer as defined under your covered auto, shall be on an excess basis.

(*Id.* ¶ 6.)  NJM also issued a personal liability umbrella policy (NJM umbrella policy) to Zalescik covering the period of April 11, 2019 to April 11, 2020.  (*Id.* ¶ 7.)  This umbrella policy has a coverage limit of $1 million.  (*Id.*)  The insuring agreement of the NJM umbrella policy reads:

> We will pay damages in excess of the minimum retained limit, for which an insured becomes legally liable due to bodily injury, personal injury or property damage.  Damages include prejudgment interest awarded against the insured.  Liability must arise from an occurrence covered by this policy.

(*Id.* ¶ 8.)  This policy defines "minimum retained limit" as the greater of:

> 1.  The total limits of any underlying insurance and any other insurance that applies to the occurrence which:
>
> > a.  Are available to an insured; or

> b. Would have been available except for the bankruptcy or insolvency of the insurer providing underlying insurance; or
>
> 2. The applicable deductible amount shown in the Declarations of this policy.

(*Id.* ¶ 9.)  "Underlying insurance" is defined as "any policy providing the insured with initial or primary liability insurance covering one or more of the 'Exposures' listed below and in the 'Deductibles' section of the Declarations of this policy." (*Id.* ¶ 10.) "The deductible amount shown in the declarations of the NJM Umbrella Policy for Automobile Liability was $500,000.00 combined single limit or $500,000.00 / $500,000.00 / $500,000.00 split liability limits." (*Id.* ¶ 11.) The NJM umbrella policy also includes an "other insurance" provision which reads "[t]he coverage afforded by this policy is excess over any other insurance available to an insured, except insurance written specifically as an excess insurance policy.  If any other specifically written excess insurance policy applies, we will contribute on a pro-rata basis." (*Id.* ¶ 12.)

## B.      Procedural Background

On February 20, 2025, PMA filed a Complaint seeking a declaratory judgment[2] that the NJM primary policy provides primary coverage for liability in the underlying lawsuit and that the PMA policy and NJM umbrella policy are co-excess coverage, and as such NJM must reimburse PMA for half of the $450,000 it paid in the settlement of the underlying lawsuit.[3] (*See* ECF No. 1

---

[2]      "Declaratory judgment actions against insurers to clarify the scope of coverage, sounding in state law, are common." *Brookside Banquets, LLC v. Selective Ins. Co.*, Civ. No. 21-08832, 2021 WL 6135940, at *3 (D.N.J. Dec. 29, 2021); *see also Allstate Ins. Co. v. Lockhardt*, Civ. No. 88-9410, 1989 WL 13698, at *1 (E.D. Pa. Feb. 15, 1989) ("An action to clarify the extent of an insurer's responsibility is an appropriate subject of a federal declaratory judgment action, even if a separate action against one who claims to be covered by the policy is pending."); *Haines v. State Auto Prop. & Cas. Ins. Co.*, Civ. No. 08-5715, 2010 WL 1257982, at *1 (E.D. Pa. Mar. 25, 2010), *aff'd,* 417 F. App'x 151 (3d Cir. 2011) ("Interpretation of an insurance policy is a matter of law properly resolved through a declaratory judgment action.").

[3]      The Court has subject matter jurisdiction under 28 U.S.C. § 1332.

at 6, 9.)[4]  On April 29, 2025, NJM answered the Complaint, opposing the relief sought and asserting two separate defenses: that the PMA policy is not an excess insurance policy and that the PMA policy must be paid out before the NJM umbrella policy can provide coverage, and as such NJM does not owe PMA any reimbursement for the $450,000 portion of the settlement it paid. (ECF No. 10 at 6-7.)  NJM also brings a counterclaim, seeking declaratory judgment that "Zalescik was an insured under the terms of the PMA Policy at the time of the accident giving rise to the Underlying Action and awarding NJM counsel fees and costs in connection with the prosecution of this Counterclaim."  (*Id.* at 8.)  On November 24, 2025, both PMA and NJM filed Motions for Summary Judgment.  (ECF Nos. 23, 24.)

## II.   **LEGAL STANDARD**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  "[I]nferences, doubts, and issues of credibility should be resolved against the moving party."  *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).  The Court must grant summary judgment

---

[4]     Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." *Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995)). Moreover, "[t]he interpretation of an insurance contract on undisputed facts is a question for the court to decide as a matter of law and can be the basis for summary judgment." *Am. Cas. Co. of Reading, Pa. v. Continisio*, 819 F. Supp. 385, 396 (D.N.J. 1993), *aff'd,* 17 F.3d 62 (3d Cir. 1994); *see also Travelers Prop. Cas. Co. of Am. v. Cont'l Ins. Co. of N.J.*, Civ. No. 10-6320, 2014 WL 4105487, at *4 (D.N.J. Aug. 19, 2014).

## III.    **<u>DISCUSSION</u>**

The parties do not raise any factual disputes; instead, this matter focuses on a legal determination as to the level of coverage—primary or excess—provided by the NJM umbrella policy and the PMA policy. (ECF No. 23-1 at 11; *see also* ECF No. 24-8 at 8.)

In general, "insurance policies may be divided into two levels of coverage: primary and excess." *Carolina Cas. Ins. Co. v. Travelers Prop. Cas. Co.*, 90 F. Supp. 3d 304, 322 (D.N.J. 2014). Primary coverage "attaches immediately upon the happening of the occurrence that gives rise to liability" while excess coverage "provides protection to an insured for liability for an amount above the maximum coverage provided by the primary policy." *Id.* (quoting *W9/PHC Real Estate LP v. Farm Family Cas. Ins. Co.,* 970 A.2d 382, 394 (N.J. App. Div. 2009)). A policy provides excess coverage when its coverage is conditioned on the existence of a separate primary policy. *Id.* at 323-24.

When two or more policies are at the same level of coverage, for example both are primary coverage, courts look to "other insurance" clauses which are designed to allocate payouts among multiple insurers. *Id.* at 322. These clauses seek "to reduce or eliminate [an insurer's] liability should another policy apply to the same risk." 15A Couch on Insurance § 220:40 (3d ed. 2025). An "other insurance" clause may be "pro rata" or "excess." *Carolina*, 90 F. Supp. 3d at 322. A pro rata "other insurance" clause provides that when "more than one insurer is liable for a loss, 'the insurer will not be liable for a greater proportion of such loss than the applicable limit of liability in the policy bears to the total applicable limit of liability of all insurance against such loss.'" *Id.* (quoting *W9/PHC Real Estate LP,* 970 A.2d at 394). An excess "other insurance" clause means that "no payment is required unless and until the other primary policy exhausts its limits." *Id.*

If two policies at the same coverage level both have "other insurance" clauses, those clauses must be reconciled. *Id.* If both clauses are pro rata there is no conflict and each policy will bear its proportionate share of loss. *Id.* If one policy has a pro rata clause and the other has an excess clause there is no conflict and both are given effect, causing the policy with the pro rata clause to be paid out first and the excess clause policy to be paid out subsequently. *Id.* at 322-23. But when both policies have excess "other insurance" clauses, "'the provisions are [deemed] "mutually repugnant," and are disregarded'; each insurer is assigned a proportionate share of the loss." *Id.* at 323 (quoting *W9/PHC Real Estate LP,* 970 A.2d at 396).

Importantly, a "true excess" policy differs from a primary policy with an excess "other insurance" provision, and the inclusion of such an "other insurance" provision does not transform a primary policy into a "true excess" policy. *Id.*; *see also CNA Ins. Co. v. Selective Ins. Co.*, 807 A.2d 247, 254 (N.J. App. Div. 2002); 15A Couch on Insurance § 220:41 (3d ed. 2025) ("As a rule,

however, excess and umbrella policies are regarded as excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or any escape clauses."). A policy is only classified as "true excess" when its coverage is conditioned on the existence of a separate primary policy, which is not determined by an "other insurance" clause; an "other insurance" clause does not determine when a policy's coverage takes effect but instead "is a device by which a primary insurer seeks to limit or eliminate its liability[.]" *W9/PHC Real Est. LP*, 970 A.2d at 394. The court must only consider an "other insurance" clause to allocate coverage among policies already determined to be at the *same* level of coverage. *See* 15A Couch on Ins. § 218:5 (3d ed. 2025) ("'Other insurance' clauses become relevant only where several insurers insure the same risk at the same level of coverage. An 'other insurance' dispute cannot arise between primary insurers and true excess insurers.").

There are three policies at issue here: the NJM primary policy, the NJM umbrella policy, and the PMA policy. The parties agree that the NJM primary policy provides primary coverage. (ECF No. 23-2 ¶ 27; ECF No. 23-1 at 4 (Defendant's Motion); ECF No. 24-8 at 4, 9 (Plaintiff's Motion).) The instant matter turns on whether the PMA policy is a "primary" policy requiring its coverage to kick in before the NJM umbrella policy coverage applies, or an "excess" policy requiring the remaining $450,000 settlement payment to be shared between the NJM umbrella policy and the PMA policy. NJM argues that because the PMA policy does not condition its obligation to provide coverage upon the exhaustion of other coverages, it is a primary policy under controlling New Jersey caselaw unlike its own umbrella policy which is "true excess" and does not attach until the PMA policy is exhausted. (ECF No. 23-1 at 8, 12-16; ECF No. 27 at 8-13.) PMA disagrees, arguing that its policy solely provides excess coverage due to its "other insurance" clause, thereby requiring NJM's umbrella policy to share responsibility for coverage under its $1

9

million policy limit.  (ECF No. 24-8 at 9-13.)  The Court finds the PMA policy provides primary coverage and therefore PMA is not entitled to recover any of the $450,000 settlement payment from NJM.

"Courts interpret insurance policies using general contract principles."  *10 E. Wash. Ave., LLC v. AmGUARD Ins. Co.*, Civ. No. 21-15695, 2024 WL 1715437, at *8 (D.N.J. Apr. 22, 2024), *appeal dismissed,* Civ. No. 24-1967, 2024 WL 4823881 (3d Cir. Aug. 2, 2024).  And "under New Jersey law, insurance coverage is a matter of contract law determined by the language of insurance agreements."[5]  *Id.* (citation modified).  As such, "[w]hen interpreting an insurance policy, courts should first look to the text of the policy."  *Id.*; *see also Com. Union Ins. Co. v. Bituminous Cas. Corp.*, 851 F.2d 98, 102 (3d Cir. 1988) ("Whether insurance is to be considered 'primary' or 'excess' is to be determined first by reference to the specific terms of the policy.").

The NJM umbrella policy was issued to Zalescik[6] and states that it provides coverage "in excess of the *minimum retained limit*" when an insured is liable for damages that "arise from an occurrence covered by this policy."[7]  (ECF No. 23-2 ¶ 7; ECF No. 24-4 at 5 (emphasis added).) "Minimum retained limit" is defined within the policy as the greater of "[t]he total limits of any *underlying insurance* and any other insurance that applies to the occurrence" or the minimum

---

[5]    The parties do not brief the issue of choice of law, although both apply New Jersey law. (*See* ECF Nos. 23-1, 27, 28 (NJM's briefs), 24-8, 25, 26 (PMA's briefs).)  "Because this Court sits in diversity jurisdiction, New Jersey law guides its interpretations of the contractual language of an insurance policy."  *Umoe Schat Harding, Inc. v. New York Marine & Gen. Ins. Co.*, Civ. No. 10-3722, 2011 WL 1211462, at *3 (D.N.J. Mar. 29, 2011).

[6]    The parties do not dispute that CHS, as Zalescik's employer, was also insured by the NJM policies.  (ECF No. 23-2 ¶ 18.)

[7]    "Occurrence" is defined as an "accident" resulting in "bodily injury and/or property damage."  (ECF No. 24-4 at 4.)  There is no dispute that the 2020 collision is an "occurrence" that would be covered by the NJM umbrella policy.

liability limit of $500,000 for automobile liability.  (*Id.* at 4 (emphasis added).)  And "underlying insurance" is in turn defined as "any policy providing the insured with initial or primary liability insurance[.]"  (*Id.* at 5.)  The policy also includes an "other insurance" clause specifying that its coverage "is *excess over any other insurance* available to an insured, except insurance written specifically as an excess insurance policy."  (*Id.* at 8 (emphasis added).)  Based on its text, the Court finds that the NJM umbrella policy provides excess coverage.  However, it kicks in only after the limits of any underlying insurance have been met, making it a "true excess" policy.  *See Carolina*, 90 F. Supp. 3d at 322-23; *W9/PHC Real Est. LP*, 970 A.2d at 196-97; *CNA Ins. Co.*, 807 A.2d at 379-80.  Further, the policy is "clearly titled an umbrella policy," (*see* ECF No. 24-4 at 2), which supports that it is a true excess policy.  15A Couch on Insurance § 220:41 (3d ed. 2025).

The PMA policy[8] is not a "true excess" policy as its terms differ from the NJM umbrella policy.  The PMA policy includes "other insurance" clauses which read, "[f]or any covered 'auto' you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance" and "[w]hen this Coverage Form and any other Coverage Form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis."  (ECF No. 24-2 at 118.)  Based on its plain language, the Court finds the PMA policy is a primary policy with excess and pro rata "other insurance" clauses.  Unlike a "true excess" policy, PMA's policy kicks in immediately upon the happening of an "accident" and does not require the exhaustion of other policy limits before its

---

[8]     This policy was issued to CHS and the parties do not dispute that Zalescik, as an employee of CHS, was also insured under the PMA policy.  (ECF No. 23-2 ¶ 16.)

11

coverage applies.[9]  (ECF No. 24-2 at 111.)  *Carolina*, 90 F. Supp. 3d at 322-23.  PMA concedes

that its policy is "not 'written specifically as an excess insurance policy,'" but focuses its argument

on the fact that its coverage is excess according to the policy's "other insurance" clause.[10]  (ECF

No. 24-8 at 13.)  While the PMA policy does state its coverage is "excess over any other collectible

insurance," (ECF No. 24-2 at 118), as discussed earlier, courts have repeatedly held that not all

references to "excess" within a policy will necessarily render that policy a "true excess policy."[11]

*See, e.g.*, *CNA Ins. Co.*, 807 A.2d at 253 ("A distinction has been drawn, however, between a

primary insurance policy containing an excess 'other insurance' clause, and a true excess policy.");

*W9/PHC Real Est. LP*, 970 A.2d at 196-97; *Carolina*, 90 F. Supp. 3d at 323-24.

---

[9]     NJM also argues that PMA "acted as a primary insurer" in the underlying litigation and so must be found to be a primary insurer now.  (ECF No. 27 at 14-15.)  This argument is unpersuasive. NJM cites no caselaw in support of its contention that CHS' counsel's statements requesting NJM to defend it as an insured in the underlying action are dispositive that the PMA policy provides primary coverage.  Instead, courts have repeatedly held that the text of the policy itself is controlling.  *Com. Union Ins. Co.*, 851 F.2d at 102 ("Whether insurance is to be considered 'primary' or 'excess' is to be determined first by reference to the specific terms of the policy."); *Di Ciurcio v. Liberty Mut. Ins. Co.*, 691 A.2d 396, 400 (N.J. App. Div. 1997) ("As to the issue of whether such coverage is primary, co-primary, or excess, we look to the terms of each policy.") (quoting *Am. Reliance Ins. Co v. Am. Cas. Co. of Reading, Pa.*, 683 A.2d 205, 206 (N.J. App. Div. 1996))).

[10]    PMA also argues that the NJM umbrella policy's "other insurance" clause indicates that it will pro rata share coverage with other excess policies, meaning that it must share the settlement payment with PMA.  (ECF No. 24-8 at 13.)  However, the NJM umbrella policy specifically notes that "[i]f *any other specifically written excess insurance policy applies*, we will contribute on a pro rata basis."  (ECF No. 24-4 at 8 (emphasis added).)  Because PMA concedes in its brief that its policy is not "'written specifically as an excess insurance policy,'" (ECF No. 24-8 at 13), this clause from the NJM umbrella policy is irrelevant to allocating PMA's coverage responsibility.

[11]    PMA additionally argues that because it "paid $450,000 of the Settlement Amount, representing the total *excess* layer of insurance coverage," PMA is an excess insurer.  (ECF No. 26 at 10 (quoting ECF No. 23-2 ¶ 28).)  This is incorrect.  PMA seizes on the usage of the term "excess" in the general sense while ignoring the distinction between "true excess" policies and primary policies with excess "other insurance" clauses, the latter of which applies in this case.

12

PMA's attempts to distinguish the proposition that "[a] true 'excess' policy is different from a primary policy that contains an excess other-insurance provision," *Carolina*, 90 F. Supp. 3d at 323, are unsuccessful. (*See* ECF No. 25 at 5-8; ECF No. 26 at 5-9.) PMA first argues that *Carolina* is not directly on point because the facts of the case differ and involved more insurers, contending that its holding "applies only to the specific situation in which a motor vehicle accident implicates multiple primary policies and multiple excess policies." (ECF No. 25 at 6.) However, nothing in the *Carolina* opinion so limits its holding; instead, the *Carolina* court broadly explains the differences between true excess and primary policies with excess "other insurance" clauses.[12]

PMA also contends that *Carolina* is not applicable because the language in PMA's "other insurance" clause differs from the language in a policy found to be primary by the *Carolina* court. (ECF No. 26 at 6.) PMA argues that because its policy's "other insurance" clause specifies that coverage is primary for autos owned by the policyholder but "excess over any other collectible insurance" for autos not owned by the policyholder, and the auto involved in the accident was owned by Zalescik rather than policyholder CHS, "there was no primary coverage available under the PMA policy in the [u]nderlying [l]awsuit." (*Id.* at 7-9.) In *Carolina*, Travelers—an insurer-defendant—also argued that its policy provided excess rather than primary coverage. 90 F. Supp. 3d at 323. The Travelers policy included an "other insurance" clause that stated "'[t]his insurance

---

[12]    PMA also argues that *Carolina* is not representative of the "well-established law of New Jersey" due to infrequent citations by other courts. (ECF No. 25 at 6-8.) But *Carolina* reiterates principles established by New Jersey state courts that have been continuously relied upon. *See, e.g., CNA Ins. Co.*, 807 A.2d at 253-54; *W9/PHC Real Est. LP*, 970 A.2d at 196-97; *Landis v. Heraz*, Civ. No. A-4279-19, 2021 WL 5045741, at *3 (N.J. Super. Ct. App. Div. Nov. 1, 2021) ("Our courts have drawn a distinction between a 'primary insurance policy containing an excess "other insurance" clause' and 'a true excess policy.'") (quoting *CNA Ins. Co.*, 807 A.2d at 253). Further, the Court is "unaware of any rule to the effect that a holding of ours expires if the case setting it forth is not periodically revalidated." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 414 n.12 (2010).

13

is excess over: (1) Any of the other insurance, whether primary, excess, contingent or on any other basis . . . (d) If the loss arises out of the maintenance or use of aircraft, 'autos' or watercraft'" *Id.* at 310. The court found that Travelers' policy was a primary policy because it "is not, like a true excess policy, wholly conditioned on the existence of a separate primary policy," even though its coverage at the primary level was excess to other primary insurers due to its "other insurance" clause. *Id.* at 323-24. This is very similar to PMA's policy in this matter. However, PMA highlights another portion of Travelers' policy as represented in Travelers' briefing, which appears before the "other insurance" clause and states that "*If other valid and collectible insurance is available to the insured for a loss we cover* under Coverages A or B of this Coverage Part, our obligations are limited [as described in the excess "other insurance" clause]." (ECF No. 26 at 6 (emphasis in original).) PMA argues that this provision "stipulate[s] that the Travelers' policy would function as excess insurance only if another applicable policy existed to cover the same loss," (*id.* at 7), while the PMA policy is truly excess because it "does not predicate its status as excess coverage on the existence of another insurance policy applicable to the same loss," (*id.* at 6). But the question of how loss is allocated among insurers *on the same coverage level* differs from the preliminary question of what level of coverage an insurer provides. The Travelers' policy's status as primary coverage was not predicted on its approach to dividing loss among insurers at the same policy coverage level, but rather on the fact that it did not require the existence of a primary policy as a condition of coverage like a true excess policy does. *Carolina*, 90 F. Supp. 3d at 323. PMA's coverage also kicks in immediately upon an accident, rendering it a primary policy akin to Travelers'. This conclusion is not disturbed by the fact that the PMA policy provides its coverage is "excess" for a covered auto the policyholder (CHS) does not own. (ECF No. 26 at

14

7-9.)  Again, this use of "excess" refers to priority of allocation among primary policies, *not* the classification of the policy level in the first instance.  *Carolina*, 90 F. Supp. 3d at 322-23.

The NJM umbrella policy's coverage attaches when the "minimum retained limit" is exceeded, meaning that the greater of the total limits of underlying insurance or the $500,000 minimum liability limit for auto accidents under the policy must be exceeded.  (ECF No. 24-4 at 4, 5.)  Because the PMA policy and the NJM primary policy both provide primary coverage, their combined liability limits of $1,500,000 ($1,000,000 for the PMA policy and $500,000 for the NJM primary policy) must be met before the NJM umbrella policy coverage kicks in.  (ECF No. 23-2 ¶¶ 1, 4.)  As the total settlement value was $950,000, the NJM umbrella policy does not apply.  (*Id.* ¶ 26.)  Because the NJM primary policy has been paid out in full, (*id.* ¶¶ 4, 27), the responsibility for the remaining $450,000 of the settlement rests with PMA.[13]

---

[13]    NJM seeks "counsel fees and costs in connection with the prosecution of this Counterclaim."  (ECF No. 10 at 8).  However, NJM does not brief this request in its Motion.  (*See* ECF No. 23.)  Should NJM seek to recoup fees, it must file an appropriate Motion with supporting documentation in compliance with Local Rule 54.2.

## IV.    CONCLUSION[14]

For the foregoing reasons, and other good cause shown, PMA's Motion for Summary Judgment (ECF No. 24) is **DENIED**, and NJM's Motion for Summary Judgment (ECF No. 23) is **GRANTED**.  An appropriate Order follows.

Dated: May 28, 2026

_____
**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**

---

[14]    Jamar Jones, the injured party and plaintiff in the underlying state lawsuit, is also named as a Defendant in this case "as a party that may have an interest in its outcome." (*See* ECF No. 1 ¶ 9.)  In answering the Complaint, Jones "demands judgment dismissing [PMA's] Complaint against him[.]" (ECF No. 12 at 5.)  Jones is properly named in this matter as courts "have frequently held that injured parties are necessary in declaratory judgment actions where questions of liability insurance coverage are litigated" in order to prevent inconsistent rulings. *Travelers Indem. Co. v. Dammann & Co.*, Civ. No. 04-5699, 2005 WL 3406374, at *3 (D.N.J. Dec. 12, 2005) (collecting cases).  However, because PMA's claim against NJM is dismissed, any claims against Jones are likewise dismissed.

16